**Marcia SINGER and David Singer, Plaintiffs,**

v.

**Frank J. LIVOTI and Livoti, O'Grady & O'Hare, Defendants.**

**No. 89 Civ. 7938 (CLB).**

United States District Court, S.D. New York.

June 12, 1990.

Lloyd D. Feld, Armonk, N.Y., for plaintiffs.

Bower & Gardner by Filip Tiffenberg, New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

This case involves allegations of federal securities fraud on the part of an attorney who helped to arrange financing for a real estate development that later failed. The Court has jurisdiction under Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v (1987), Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1987), 28 U.S.C. § 1331 (1980) and the principles of pendent jurisdiction.

By motion heard and fully submitted on April 4, 1990, defendants move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) on the ground that the short-term promissory note at issue in this lawsuit is not a "security" within the meaning of the federal securities laws and therefore the pendent state claims should be dismissed. The parties have submitted affidavits addressing several specific issues relevant to these motions, but have submitted no Local Rule 3(g) statements. The Court assumes for purposes of these motions that the allegations contained in the complaint, as amplified by the affidavits, are substantially true.

The complaint, filed on November 30, 1989, alleges that Frank J. Livoti, a member of the defendant law firm of Livoti, O'Grady and O'Hare, whose offices are lo-

cated in Mineola, New York, misrepresented material facts to induce his clients Marcia and David Singer, residents of Westchester and New York counties respectively, to "purchase" a promissory note ("Note") from Frank G. Nocito, also Livoti's client. The Note, dated June 23, 1986, was payable to Marcia Singer in the principal amount of $350,000. It carried interest payable at maturity at the annual rate of ten (10) percent and was due December 23, 1986, six months after its issuance. To secure payment, Hickory Ridge Associates, Ltd., a corporation of which Nocito was the principal, executed and delivered a mortgage on real property at Armonk, New York that Nocito was engaged in developing. On maturity of the Note, a Refinanced Note due in six months was issued.

Plaintiffs claim that the discussions leading up to the "purchase" of the Note began in June of 1986 when Livoti, representing Nocito, phoned his client, David Singer, to ask if Singer would be willing to make a loan in connection with the development of a residential real estate subdivision in Armonk, New York. During that conversation, Livoti allegedly stated (1) that Nocito was an experienced builder, (2) that the project had excellent prospects, and (3) that the loan would be safe. A few days later, Livoti provided Singer with an independent appraisal, dated November 14, 1984, describing the property known as Hickory Ridge to consist of eighteen (18) building sites (including lots 9, 24, 25) with an aggregate market value, if sold over three years, of $3,285,000.[1]

A few days after receiving the appraisal, David Singer met Livoti and Nocito at a restaurant in the Stouffer's Hotel in White Plains, New York. During that meeting, Nocito, not sued here, allegedly stated that he planned to build luxury homes for sale in the million-dollar range, had developed other similar projects successfully, had a lot of his own money invested in this latest project, and wanted Singer "to make a loan to the project with the opportunity to make an equity investment in the project." Plaintiffs' Complaint at ¶ 10(d). Plaintiffs describe this last representation as the " 'carrot' " of an equity interest, arguing that "the loan was to be a prelude to an equity investment in the project ... so the plaintiffs sought profit, not only in the form of interest, ... but also as future equity participation." Plaintiffs' Memorandum In Opposition at 3 n. 2, 15.[2] David Singer's affidavit, however, distinguishes between the loan and the offer of equity participation. Singer states:

> Nocito asked me to loan $350,000 to finance the development of luxury homes being built by his company, Hickory Ridge Associates, Ltd. in Armonk, New York. He also offered me the opportunity to become an equity participant in the project.

Affidavit of David Singer (March 21, 1990) at 1–2. Singer does not assert, nor can he, that the Note or Refinanced Note (Exh. C to Saretsky Aff.) included a right to equity participation above and beyond the payment of fixed, market-rate interest at 10%. Nor does he claim that, as partial consideration for the loan, Nocito offered him an oral or written option to invest in equity on specific terms at some future date. Rather, the parties seem to have understood from the outset that the loan and the invitation to make an equity investment were separate and independent transactions. Thus, insofar as the complaint seeks to state a federal securities claim, it does so based on a conclusion of the pleader that the Note, on its own terms, qualifies as a "security" and not because of some vague, inarticulable equity investment or prelude thereto.

Taken as a whole, the complaint alleges reckless or deceptive representations in

---

1. City Federal Savings Bank, the senior mortgagee of the Hickory Ridge property, held a foreclosure sale on March 7, 1990. The total amount bid for the eighteen lots was $3,819,800, less than City Federal's senior liens. Affidavit of Lloyd D. Feld, Esq. (March 21, 1990) at 3 and Exh. D.

2. The Court is not sure what a "prelude to an equity investment" is, but assumes that it refers to an interest in property unknown to the common law.

connection with the "purchas[e] from Nocito for $350,000 [of] Nocito's promissory note[.]" Plaintiffs' Complaint at ¶ 11. Specifically, plaintiffs claim that defendants misrepresented Nocito's experience and credentials; advised against recording the mortgage, thereby depriving plaintiffs of any effective security interest; urged plaintiffs to refinance the Note for three additional months, even though doing so meant cancelling the original obligation, accruing interest already due, and accepting a new three-month note ("Refinanced Note") in the higher principal amount of $367,500; and failed to discover or deliberately concealed material facts relating to the property offered as security for the Note and Refinanced Note. With respect to this last issue—the adequacy of Nocito's collateral—plaintiffs assert that defendants knew or should have known about prior mortgages containing prohibitions against subsequent mortgage loans, delinquent indebtedness to prior mortgage-holders, mechanics' and tax liens totalling more than one million dollars, outstanding debts to Livoti and his law firm for past professional services, and Nocito's loss of title to three of the Hickory Ridge properties (lots 9, 24 and 25) that had been included in the original appraisal and pledged as security for the Refinanced Note.

■ To prevail at trial, plaintiffs need not prove that these misrepresentations or omissions were deliberate. It is well settled that reckless conduct may give rise to liability under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), reserved decision on the question of whether recklessness satisfies the scienter requirement of Section 10(b) and Rule 10b–5, but the circuit courts have been unanimous in holding that recklessness provides an adequate basis for liability. *See generally* Jennings & Marsh, *Securities Regulation* (Foundation Press 1987) at 955–957 (citing cases); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111 (2d Cir.1982); *Rolf v. Blyth, Eastman, Dillon & Co.*, 570 F.2d 38 (2d Cir.1978), *cert. denied* 439 U.S. 1039, 99

S.Ct. 642, 58 L.Ed.2d 698. "Reckless conduct [under Section 10(b) and Rule 10b–5] may be defined as ... highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.1977), *cert. denied* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). The recklessness standard comes "closer to being a lesser form of intent than merely a greater degree of ordinary negligence." *Sanders v. John Nuveen & Co.*, 554 F.2d 790 (7th Cir.1977). Applying this standard, this Court might well conclude that plaintiffs' claims more nearly resemble allegations of negligence than of fraud. But the record in this case is not yet complete, and it would be premature for the Court to decide at this time whether defendants are entitled to summary judgment on the issue of scienter.

■ Instead, defendants' motion to dismiss confronts this Court only with the antecedent question of whether the Note and the Refinanced Note are "securities" within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78c(a)(10). Defendants' motion to dismiss relies on alternative grounds, citing Fed.R.Civ.P. 12(b)(1) and 12(b)(6), but the Court notes at the outset that the objection to subject matter jurisdiction lacks merit. Frivolous claims interposed solely for the purpose of manufacturing jurisdiction may be dismissed on jurisdictional grounds, but jurisdiction "is not defeated ... by the possibility that ... averments might fail to state a cause of action on which petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). Plaintiffs here will secure the relief sought in their complaint only if they can establish that the Securities Exchange Act of 1934 applies to this short-term promissory note under the particular totality of circumstances of the case. A resolution by this

Court of whether, upon the facts pleaded, the federal statute was violated to the extent of giving rise to a private action for damages must be regarded as an adjudication on the merits, binding in any subsequent litigation between the parties, as contrasted with a dismissal for want of subject matter jurisdiction, which has no preclusive effect. We therefore decline to dismiss plaintiffs' complaint under Rule 12(b)(1). See *Bell v. Hood, supra.*

One further preliminary issue requires discussion. Plaintiffs frame their federal securities allegations not only in terms of Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 but also in terms of Section 17(a) of the Securities Act of 1933. In their brief, they concede that "[i]nasmuch as [their] 10b–5 claim is virtually identical to their claim under Section 17(a) of the Securities Act of 1933, the dismissal of the Section 17(a) claim will not effect [sic] this action." Plaintiffs' Memorandum in Opposition at 31. This concession, proceeding as it does from an assumption that Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act are coextensive, has a familiar ring in this circuit.

Faced with considerable doubt that Section 17(a) of the 1933 Act confers an implied private right of action, our Court of Appeals occasionally has downplayed the importance of the whole issue by suggesting that a private right of action under Section 17(a) of the 1933 Act merely would replicate the private right of action already provided by Section 10(b) of the 1934 Act. In *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1283–84 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), the Court of Appeals left open whether Section 17(a) of the 1933 Act created a private right of action, noting Judge Friendly's remark concurring in *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 867 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), that denying a private right of action under Section 17(a) makes little difference once it has been established that an aggrieved buyer may sue under Section 10(b) of the 1934 Act. Later, in *Kirshner v. United States,* 603 F.2d 234 (2d Cir.

1978), the Court of Appeals reversed a district court decision denying a private right of action under Section 17(a) of the 1933 Act, but minimized the significance of its holding by suggesting that Section 17(a) and Section 10(b) are coextensive. Most recently, in *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 559 n. 3 (2d Cir.1985), the court questioned its holding in *Kirshner,* and observed once again that "[h]ere, as in so many instances, § 10(b) of the Securities Exchange Act and Rule 10b–5 afford plaintiff the same relief as would § 17(a) of the Securities Act."

We are not persuaded that Section 17(a) of the 1933 Act and Section 10(b) of the 1934 Act are congruent provisions. As the Fifth Circuit has suggested, "the main reason for the somewhat awkward development of the law under § 17(a) of the 1933 Act is the fact that it has traditionally lived in the shadow of another area of securities law: Rule 10b–5 ... When the judiciary recognized a private cause of action under Rule 10b–5 shortly after its promulgation, cases that might have fit a § 17(a) cause of action were instead decided under Rule 10b–5." *Landry v. All American Assurance Co.,* 688 F.2d 381, 386 (5th Cir.1982). After the Supreme Court held that liability under Section 10(b) and Rule 10b–5 requires proof of scienter, *see Ernst & Ernst v. Hochfelder, supra,* the trial courts quite naturally assumed that the same analysis would apply to claims under Section 17(a) of the 1933 Act. But it does not, for in *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Supreme Court held that the elements of a claim under Section 10(b) of the 1934 Act differ from those under Section 17(a) of the 1933 Act. In *Aaron* the Court adhered to *Ernst & Ernst* insofar as concerned proof of scienter in an SEC civil injunction proceeding under Section 10(b) and Rule 10b–5 of the 1934 Act, but concluded that the elements of proof under Section 17(a) are quite different. As the Court wrote,

The language of § 17(a) strongly suggests that Congress contemplated a scienter requirement under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).

The language of § 17(a)(1), which makes it unlawful "to employ any device, scheme, or artifice to defraud," plainly evinces an intent on the part of Congress to proscribe only knowing or intentional misconduct . . .

By contrast, the language of § 17(a)(2), which prohibits any person from obtaining money or property "by means of any untrue statement of a material fact," is devoid of any suggestion whatsoever of a scienter requirement . . .

Finally, the language of § 17(a)(3), under which it is unlawful for any person "to engage in any transaction, practice or course of business which *operates* or *would operate* as a fraud or deceit," (emphasis added) quite plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible . . .

It is our view, in sum, that the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).

446 U.S. at 695–97, 100 S.Ct. at 1955–56. The Court in *Aaron* never reached the issue of whether Section 17(a) confers an implied private right of action, but it is doubtful, in light of the Court's decision to apply the same Rule 10b–5 scienter standard to SEC and private claims, that Section 17(a) of the 1933 Act would be interpreted any differently in the context of a private claim if one exists. Thus, if an implied private right of action were to exist at all, Section 17(a) might become "an attractive, viable alternative to actions brought under Rule 10b–5, at least as to those based upon negligence." *Landry, supra* at 387.

Once we acknowledge, as in light of *Aaron* we must, that the elements of a claim under Section 17(a) of the 1933 Act may differ from those under Section 10(b) of the 1934 Act, it becomes necessary to decide whether Section 17(a) implies a private right of action. This Court can no longer assume that the dismissal of a Section 17(a) claim does not matter on the theory that if an implied right of action exists it is coterminous with a claim under Rule 10b–5.

Section 17(a) might afford these plaintiffs an opportunity to prevail on a theory of negligent as opposed to reckless misrepresentation, or perhaps even on an "untrue" statement of a material fact reasonably believed in good faith to have been true when uttered. Liability under Section 17(a)(2) seems almost absolute on its face, similar to a breach of warranty, and since Section 17(a) seems to prohibit conduct insufficient to support a finding of scienter, the issue of whether Section 17(a) implies a private right of action is squarely presented.

Sixteen years ago, in *Welch Foods Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, 1401 (S.D.N.Y.1974), this Court held that there was no private right of action implied under Section 17(a) of the Securities Act of 1933. Relying on the specific civil and criminal penalties enumerated in the Act, the Court concluded that any generalized right of action under Section 17(a) would undercut the legislative scheme by "permit[ting] plaintiffs to circumvent the limitations" on liability imposed by other, more carefully tailored provisions. *Id.* Now, in the wake of *Aaron* and at least three Supreme Court decisions declining to decide the question of an implied right of action under Section 17(a), *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 1924 n. 6, 44 L.Ed.2d 539 (1975), *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 557 n. 9, 99 S.Ct. 790, 795 n. 9, 58 L.Ed.2d 808 (1979), *Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), we are more convinced than ever that Section 17(a) confers no implied private right of action.

That the SEC may bring an enforcement action under § 17(a) based solely on negligence does not imply that thousands of private attorneys general, including the entire class action bar, are permitted to do so. At least when the SEC brings a civil enforcement action—particularly one for injunctive relief—it does so after assessing whether the alleged misstatement was trivial (in which case the market will correct

itself at low cost) or serious (in which case regulatory intervention may be needed because too many people will rely on the misinformation before the market corrects itself). Private litigants, by contrast, bring suit based on purely individual incentives, and if permitted, will file claims for each and every loss that might be attributable to bad information. Allowing private litigants to sue based solely on negligent misrepresentation, the undeniable standard in light of *Aaron*, or on untruths reasonably believed to be true, a literal reading of Section 17(a)(2) and (a)(3), would result in excessive enforcement and burden the nation's financial markets and courts with too many lawsuits serving no valid public purpose and lacking express Congressional authorization.

This Court not only believes that it would be improvident for the judiciary to conjure up an implied private right of action under Section 17(a), but we are convinced that Congress did not want any such right of action. In language strongly reminiscent of our opinion in *Welch Foods*, the Fifth Circuit has explained the legislative scheme of the 1933 Act as follows:

> The [Act] contains two express civil liabilities for the protection of purchasers. The first of these is § 11 which prohibits falsehoods and omissions in the registration statement. The second is § 12(2) which protects purchasers from misstatements or omissions in written or oral communications. Together these sections confer specific private rights upon purchasers. Before a purchaser may successfully bring suit under either of these two sections, however, strict procedural requirements must first be satisfied. Section 17(a)(2) prohibits the same type of conduct as §§ 11 and 12, but has none of the limitations imposed by Congress. The creation of an implied cause of action § 17(a) under these circumstances would effectively frustrate the carefully laid framework of the Act.

*Landry, supra*, 688 F.2d at 390. We agree with this analysis, and in light of the uncertainty noted in *Yoder*, conclude that we are free to follow the Fifth Circuit's lead.

As in *Welch Foods*, plaintiffs' claims for securities fraud are dismissed insofar as they are brought pursuant to Section 17(a) of the Securities Act of 1933. We therefore analyze the issue of whether the Note and Refinanced Note are "securities" solely in terms of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

To ascertain whether the Note and Refinanced Note are "securities" within meaning of the Securities Exchange Act of 1934, we begin by examining the statute itself. Section 3(a)(10) states:

> (a) Definitions
>
> When used in this chapter, *unless the context otherwise requires—*
>
> (10) The term "security" means *any note*, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; *but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.*

15 U.S.C. § 78c(a)(10) (1989) (emphasis added). The statute defines "security" in both specific and general terms, endeavoring "to include within the definition the many types of instruments that in our commer-

cial world fall within the ordinary concept of a security." H.R.Rep. No. 85, 73 Cong., 1st Sess. 11 (1933). This itemization is not meant to be exhaustive. As the Supreme Court has emphasized in discussing the definitional section of the Securities Act of 1933, "the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a security.'" *SEC v. C.M. Joiner Leasing Corporation,* 320 U.S. 344, 350–51, 64 S.Ct. 120, 123–24, 88 L.Ed. 88 (1943) (Jackson, J.) (oil leaseholds sold upon premise that purchasers would profit from increased value of their leases upon the anticipated future discovery of oil on adjacent land, constituted "investment contracts," and therefore "securities").

In recent years, some courts have interpreted the prefatory phrase "unless the context otherwise requires" as authority for disregarding the specific enumeration of instruments and proceeding directly to an analysis of the so-called "economic realities" of the transaction. For instance, in cases where an entrepreneur has purchased an entire company by acquiring its "stock", or where a commercial lender has extended credit in return for a promissory "note" with longer than nine months maturity, courts often have disregarded the specific language of § 3(a)(10) and assessed the transaction in purely economic terms. *See e.g. Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982) (Posner, J.). In *SEC v. American Board of Trade, Inc.,* 751 F.2d 529 (2d Cir.1984), our Court of Appeals explained that

> [t]he course of decisions under § 3(a)(3) of the 1933 Act exempting short term paper from registration requirements and § 3(a)(10) of the 1934 Act excluding such paper from the definition of security "unless the context otherwise requires" has made plain that these sections are not to be read literally. *See, e.g., Exchange National Bank v. Touche*

*Ross & Co.,* 544 F.2d 1126, 1133 (2d Cir.1976); *Franklin Savings Bank v. Levy,* 551 F.2d 521, 527 (2d Cir.1977). It is unnecessary for purposes of this case to indulge in an exhaustive review of the cases; suffice it here to say that just as a note with a maturity longer than 9 months may not always be a security within § 3(a)(10) of the 1934 Act, *see Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930 (2d Cir.), *cert. denied,* [469] U.S. [884], 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), so a note with a maturity of less than 9 months may not enjoy the exemption from registration afforded by § 3(a)(3) of the 1933 Act and may be a security under § 3(a)(10) of the 1934 Act.

*Id.* at 538. In *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), the Court of Appeals held that a promissory note payable on demand was a security within the meaning of § 3(a)(10) of the 1934 Act. The court assumed but did not find that a demand note is "due" on the day of its issuance, and reasoned in dictum that "the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b–5, unless the note fits the general notion of 'commercial paper' reflected in [SEC Release No. 33–4412, 26 Fed.Reg. 9158, 9159 1961)]." *Id.* at 800. That SEC release established a narrow definition of short-term commercial paper, limiting § 3(a)(10)'s exception to "prime quality negotiable commercial paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve Banks". In *Zeller* the Court of Appeals seemed to adopt this definition as a binding interpretive gloss on the statute itself.

Later, in *Exchange National Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1133 (2d Cir.1976), and in the absence of any SEC Release setting forth the circumstances under which a promissory note from a bank with a maturity of *more* than nine months might *not* be a security within § 3(a)(10) of

the 1934 Act, the Court of Appeals concluded that "the best alternative now available may lie in greater recourse to the statutory language." 544 F.2d at 1137. The court held that the burden of proving whether "the context otherwise requires" falls on the party asserting that a long-term note is not a security. The court in *Exchange National Bank* not only declined to overrule *Zeller* but quoted from that earlier decision with approval. *Exchange National Bank*, 544 F.2d at 1131, 1133–34; *see also SEC v. American Board of Trade, Inc., supra*, at 539 n. 8. As the Supreme Court explained in describing the jurisprudence of this circuit,

> The Second Circuit's version of the family resemblance test provided that only notes with a term of more than nine months are presumed to be "securities." ... No presumption of any kind attached to notes of less than nine months duration. The Second Circuit's refusal to extend the presumption to all notes was apparently founded on its interpretation of the statutory exception for notes with a maturity of nine months or less. Because we do not reach the question of how to interpret that exception ... we likewise express no view on how that exception might affect the presumption that a note is a "security."

*Reves v. Ernst & Young,* — U.S. —, — n. 3, 110 S.Ct. 945, 951 n. 3, 108 L.Ed.2d 47 (1990).

Without concerning ourselves with the issue of whether or not any presumption attaches to promissory notes with a maturity of less than nine months, we analyze the Note and the Refinanced Note in this context under the criteria set forth by the Supreme Court in *Reves v. Ernst & Young, supra*, thereby assuming for purposes of this decision that the specific exception set forth in Section 3(a)(10) cannot be applied in accordance with its plain meaning and without regard to context. It has long been recognized that the central purpose of the federal securities law is "to eliminate serious abuses in a largely unregulated securities market," *United Housing Foundation Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975),

and that "in defining the scope of the market that it wished to regulate, Congress painted with a broad brush." *Reves v. Ernst & Young, supra,* — U.S. at —, 110 S.Ct. at 949. But Congress did not "provide a broad federal remedy for all fraud," *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982), and for this reason, the Supreme Court's test for assessing whether a "note" is a "security" avoids subjecting routine commercial transactions to federal securities regulation. As the Court explained in *Reves:*

> First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." [Citation omitted.] Second, we examine the "plan of distribution" of the instrument, *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 353 [64 S.Ct. 120, 124, 88 L.Ed. 88] (1943), to determine whether it is an instrument in which there is "common trading for speculation or investment," *id.* at 351 [64 S.Ct. at 123]. Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction. [Citations omitted.] Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application

of the Securities Acts unnecessary. [Citation omitted.]

We conclude, then, that in determining whether an instrument denominated a "note" is a "security," courts are to apply the version of the "family resemblance" test that we have articulated here: a note is presumed to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument. If an instrument is not sufficiently similar to an item on the list, the decision whether another category should be added is to be made by examining the same factors.

—— U.S. at ——, 110 S.Ct. at 951–952. The "enumerated categories of instrument" to which the Court refers are those set forth by our Court of Appeals in *Exchange National Bank, supra,* and *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2d Cir.1984). These include "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)." *Exchange National Bank, supra* at 1138. In *Chemical Bank, supra* at 939, the Court of Appeals added "notes evidencing loans by commercial banks for current operations" to its list of instrument that are not "securities."

■ On the assumption that *Zeller*'s restrictive interpretation of the statutory exception for short-term promissory notes is still good law in this Circuit, the Note and the Refinanced Note initially must be presumed to be "securities". We consider whether such presumption, if valid, is rebutted by the context in this case first by examining the specific categories of excluded instruments enumerated in *Exchange National Bank* and *Chemical Bank, su-*

*pra.* Upon concluding that the Note and Refinanced Note may not fit squarely within any of these categories, we then turn to the four general criteria set forth in *Reves.*

The enumerated categories include a "note secured by a mortgage on a home". This case presents not a note secured by a mortgage on a home but rather a note secured by a mortgage on a number of homes. It is a note issued in a commercial lending context through the conduit of a lawyer, although perhaps a lawyer who in this deal had one client too many. Traditionally, obtaining private conventional mortgage financing of real property has been a function of lawyers and other regulated professionals, including real estate brokers and mortgage brokers, who present mortgage lending opportunities to their clients or introduce their real estate owning clients to potential private mortgage lenders. Today, and since the beginning of the Republic, a substantial number of conventional mortgage loans are made by private individuals, largely through the aid of knowledgeable intermediaries such as lawyers and real estate or mortgage brokers. It is hard to see why an exception for a conventional real estate mortgage should be different simply because it covered "a home" rather than, for example, a storefront, an office building, a series of homes, or vacant land. Accordingly, we conclude this instrument is not a security because it resembles one of the instruments enumerated in *Exchange National Bank* and approved in *Reves.* If we are wrong in this interpretation, and instead assume for the purposes of argument that the mortgage exception was intended to be limited only to a single family residence on a single parcel (a rather foolish assumption), then we must focus on the four broader criteria announced in *Reves.*

First, we consider the "motivations that would prompt a reasonable seller and buyer to enter into [the transaction]." This test is somewhat tautological, for it states that if the seller's purpose is "to raise money for the general use of a business enterprise or to finance substantial capital investments," the instrument is likely to be

a security, whereas if the note is exchanged "to correct for the seller's cash flow difficulties, or to advance some other commercial or consumer purpose," it is "less sensibly so described." In the present case, however, the context of the transaction shows that Nocito was temporarily financially embarrassed. Surely he was not seeking this loan in this amount from this source to "finance substantial capital investments" or "for the general use of a business enterprise" because, as discussed above, he already had done so with a multi-million dollar line of credit from a major bank. Clearly he was undergoing "cash flow difficulties," and this fact is further evidenced by the short duration of the Note and Refinanced Note. This transaction shows all of the economic context of a temporary loan to solve cash flow difficulties, not a permanent or semi-permanent source of capital investment with which to operate a major long-term real estate venture such as would be involved with the construction of eighteen homes, each in the million dollar price range, in Westchester County, New York.

The second factor in the *Reves* analysis, the "plan of distribution" of the instrument, need not detain us. There was no such plan. As pointed out above, the borrower followed the traditional process of the market in private, non-institutional, conventional mortgage loans; he went through his lawyer.

The third factor, involving public expectations, also seems inapplicable. Surely there was no public expectation that a short term note of this sort would be traded or speculated in as a security, for the most that any purchaser could derive would be the collection of interest at 10% for less than a year and the cementing of good will with Nocito as a "prelude to an equity investment" in the Hickory Ridge property.

Finally, we note the existence of "some factors such as existence of another regulatory scheme which reduces the risk of the instrument." If we regard this instrument as one of many commonplace and successful conventional mortgage loan transactions between private lenders and private borrowers (which is what it would have been but for the fraud), there is a state regulatory scheme present that significantly reduced the risk of the instrument. Such instruments are ordinarily generated, as this one was, through the intermediary of a licensed professional, such as an attorney, real estate broker or mortgage broker. New York maintains a complete statutory scheme to assure fidelity of these professionals to their clients and customers. *See generally* New York Judiciary Law § 460 *et seq.* (lawyers); New York Banking Law § 591–a *et seq.* (mortgage brokers); New York Real Property Law § 440–a *et seq.* (real estate brokers and salesmen). Furthermore, all states provide for public recordation of mortgages, an opportunity for mortgage lenders to search out prior liens and defects in title in the public record before investing, and give statutory protection by such recordation against subsequent encumbrancers of the collateral. Indeed, the fact that a note is collateralized by tangible property has been recognized by the Supreme Court as a risk reducing factor which may suggest an investment is not a "security". *See Reves, supra,* —— U.S. at ——, 110 S.Ct. at 953.

Plaintiffs would have us disregard the mortgage because, allegedly on advice of attorney Livoti, they failed to record it in the County Clerk's office until just prior to default. It is bizarre for an attorney ever to advise a client who had bargained for a mortgage to refrain from recording it and thereby to fail to perfect the lien which the mortgage grants. Still, that this allegedly happened in this case, for whatever reason, should not affect the federal statutory classification of the paper that passed between Nocito and plaintiffs. It is a note secured by a real estate mortgage even if Livoti, as is claimed, counseled Mr. Singer not to record it.

Plaintiffs also allege that the prior mortgages held by City Federal prohibited junior financing. Such prohibition, of course, under New York law does not prevent perfecting the lien of a junior mortgage by recording it; the worst that would happen is that the recording of the junior mort-

gage might trigger a default at the option of the holder of the prior lien.

A New York mortgage is a serious document, creating a significant statutory lien on real property. Indeed, in many states a mortgage, like a deed, conveys an actual interest in real property. Real property transactions have always been regarded as essentially local in nature. It is hard to believe that Congress would have intended to sweep them into the statutory scheme for the regulation of securities transactions affecting interstate commerce merely by the words of Section 3(a) of the 1934 Act.

Based on the foregoing analysis, we believe that the complaint here fails to state a claim arising under the federal securities laws because the Note and Refinanced Note are not "securities" within the 1934 Act and because there is no implied private cause of action under Section 17(a) of the 1933 Act. That there are significant claims pleaded under the laws of New York involving fraud and professional malpractice need not concern us, for there is no allegation of diversity of citizenship.

The complaint is dismissed. The Clerk shall enter a final judgment. No costs.

So ordered.