Stephen J. POLLACK, et al., Plaintiffs–Appellants,

v.

LAIDLAW HOLDINGS, INC., et al., Defendants–Appellees.

No. 1149, Docket 93–7993.

United States Court of Appeals, Second Circuit.

Argued March 10, 1994.

Decided June 22, 1994.

Steven M. Edwards, New York City (Davis, Scott, Weber & Edwards, P.C., Ellen Wahl Parker, Jonathan A. Greenberg, of Counsel), for plaintiffs-appellants.

Richard G. Cushing, New York City (David T. Eames, G. Wade Leak, Bodian & Eames, of Counsel), for defendants-appellees.

Simon M. Lorne, General Counsel, Jacob H. Stillman, Associate General Counsel, Eric Summergrad, Principal Asst. Gen. Counsel, Randall W. Quinn, Sr. Litigation Counsel, Paul Gonson, Sol., of Counsel, Securities and Exchange Com'n, Washington, DC, amicus curiae.

Before LUMBARD, FEINBERG and MINER, Circuit Judges.

FEINBERG, Circuit Judge:

This is an interlocutory appeal, pursuant to 28 U.S.C. § 1292(b), from an order issued in January 1993 in the United States District Court for the Southern District of New York, Peter K. Leisure, J., dismissing claims brought under the federal securities laws, RICO and state law. Plaintiffs-appellants are two doctors, the son of one of them, the personal retirement plans of the doctors (and their employees) and a family trust of one of the doctors (collectively, Pollack or appellants). Defendants-appellees are corporate entities in the securities and investment counselling business and the officers of these corporations (collectively, Laidlaw or appellees). Pollack claims that Laidlaw fraudulently invested Pollack's funds in "uncollateralized, speculative participations in mortgages," some of which were "fictitious and oversubscribed," resulting in a loss of more than one million dollars. After the district court's January 1993 order, Pollack requested the court to certify the order for interlocutory review under 28 U.S.C. § 1292(b). The court granted the request in a brief opinion, which described the "controlling question of law" as whether the participations constitute "securities" under federal law. For reasons set forth below, we answer the question in the affirmative, reverse the order of the district court and remand for further proceedings.

## I. Background

The order appealed from dismissed Pollack's securities claims pursuant to Fed. R.Civ.P. 12(b)(6). For the purpose of this appeal, therefore, we accept as true all of the factual allegations in the complaint, and draw all inferences in favor of Pollack. The following statement of facts is taken from the amended complaint and from the opinion of the district court.

### A. Factual Allegations

Appellants are passive, unsophisticated investors, who relied on professionals to manage their money. In the 1970s, they began dealing with Walter L. Twiste, a broker and investment advisor. This relationship continued beyond 1977, when Twiste began an association with the companies that allegedly became the Laidlaw corporations. As of May 1990, appellants' accounts with Laidlaw exceeded $3.5 million. This money was in discretionary accounts, and Laidlaw received an investment management fee on the portfolio as well as commissions on executed transactions. Appellants received by mail written confirmation of all transactions, as well as monthly statements.

Appellants' standing instruction to Laidlaw was to pursue conservative, low-risk investments. For example, appellants' portfolio consisted mostly of investment grade bonds

and other debt instruments, rather than equities or "junk" bonds. Appellants allege that in 1985 they noticed references to "promissory notes" connected to various properties. Twiste told appellants that these were mortgages, primarily short-term bridge loans for construction and cooperative conversions, and that the mortgages were "sound, guaranteed and secured," consistent with appellants' investment objectives.

In June 1990, appellants learned that Twiste had left Laidlaw and had been admitted into a mental institution; Laidlaw informed them that Twiste had committed "serious acts of fraud," including stealing money from clients' accounts. At approximately the same time, appellants found out that the mortgage investments were the result of transactions with Eagle S.A. Funding Company (Eagle), an entity of whom appellants had never heard. In May 1990, one of the Eagle partners had committed suicide and the company had gone into bankruptcy. Allegedly, Laidlaw had failed to investigate the mortgage investments obtained through Eagle, and Twiste was receiving commissions from Eagle as well as from Laidlaw. Appellants also found out that the mortgage participations, which had terms of approximately one to three years, were not secured, as represented by Twiste. Many of the underlying mortgages were unsecured and unrecorded. Appellants' interests in the mortgages were uncollateralized and speculative at best, and "fictitious and/or oversubscribed" at worst, but from 1985 to 1989 appeared to provide satisfactory returns because funds of new investors were used to make payments on existing accounts. Although Eagle stopped making payments in May 1989, Laidlaw continued to send appellants portfolio evaluations from May 1989 to June 1990 showing allegedly fictitious interest and principal payments.

B. Proceedings in the District Court

After some initial cooperation from Laidlaw, followed by failed settlement discussions, appellants determined that they had suffered a loss of $1,093,924. In September 1990, Pollack filed the original complaint. Laidlaw moved to dismiss the complaint based mainly on lack of particularity under Fed.R.Civ.P. 9(b).

Prior to the disposition of that motion, appellants took Twiste's deposition. Twiste admitted to misrepresenting the mortgage interests, receiving kickbacks and making fictitious entries in appellants' statements, and he described the mortgage interests in greater detail. Appellants then filed an amended complaint in June 1991.[1]

Count I of the complaint alleged the sale of unregistered securities in violation of §§ 5(a), 5(c) and 12(1) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c) and 77$l$(1). Count II alleged misrepresentations and omissions in violation of § 12(2) of the 1933 Act, 15 U.S.C. § 77$l$(2). Count III alleged securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. Counts IV and V alleged violations of RICO, 18 U.S.C. § 1962(c), and counts VI through X alleged pendent state claims based on breach of fiduciary duty, conversion, fraud and deceit, negligent misrepresentation and misrepresentation. Appellants requested not less than $1,093,924 in damages or as a part of a rescission remedy, $10 million in punitive damages, interest income, treble damages under RICO and costs.

The Laidlaw defendants again moved to dismiss, and in January 1993 the district court granted the motion. The district court ruled that: (1) the securities claims should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because the mortgage participations were not securities; and (2) the RICO claims should be dismissed pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity on the part of Laidlaw, and pursuant to Rule 12(b)(6) because under RICO Laidlaw could not be held liable for Twiste's acts on a theory of respondeat superior. The district court declined to exercise supplemental jurisdiction over the state law claims, but granted appellants leave to file an amended complaint to replead the RICO counts as well as the pendent claims.

---

1. In May 1991, the Securities and Exchange Commission (SEC) initiated proceedings against Twiste and Laidlaw, which culminated in remedial sanctions.

Appellants then moved to file a second amended complaint to cure the Rule 9(b) defects. At the same time, appellants sought to add one count under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., and moved for certification of the January 1993 order. Laidlaw did not oppose certification.

In June 1993, the district court issued an opinion and order granting the motion for certification. The district court held that the securities issue was appropriate for certification, noting that "[w]hether the mortgage participations purchased on behalf of the plaintiffs were securities is an issue that is on the fringe of the law in this developing area." However, the district court did not certify the issue of vicarious liability under RICO, both because appellants were granted leave to replead to establish Laidlaw's direct liability under RICO and because the district court believed that there was not "substantial ground for difference of opinion" as to its holding that there is no vicarious liability under RICO.[2]

In September 1993, this court permitted the appeal. Thereafter, the SEC sought, and obtained, permission to file an amicus brief in support of appellants' view that the interests sold in this case are securities.

## II. Discussion

 This appeal requires us to engage again in the difficult task of applying the legislative definition of "security." See Louis Loss & Joel Seligman, 2 Securities Regulation 869–71 & n. 5 (3d ed. 1989) (noting dissatisfaction with judicial efforts in this area). Appellants and the SEC argue that the district court erred in dismissing their claims under the federal securities laws, because the mortgage participations were securities under both section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1), and section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10). Specifically, appellants allege that the mortgage participations were notes and investment contracts, two types of instruments regulated under the federal securities laws.[3] While the definitions of securities in the 1933 and 1934 Acts are not identical, the definitions are treated as identical in "decisions dealing with the scope of the term." *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 686 n. 1, 105 S.Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985).

### A. The *Reves* Factors

 We must determine whether the mortgage participations are regulated by the securities acts by applying the "family resemblance" test enunciated by the Supreme Court in *Reves v. Ernst & Young,* 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). See *Banco Espanol de Credito v. Security Pac. Nat'l Bank,* 973 F.2d 51, 55 (2d Cir.1992), cert. denied, — U.S. —, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993). Under the family resemblance test, a note is presumed to be a security unless the note resembles one of the several judicially-enumerated instruments that are not securities. *Reves,* 494 U.S. at 65, 110 S.Ct. at 951 (citing *Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1138 (2d Cir.1976); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2d Cir.), cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984)).[4] In applying this test, we look to four factors. If the note is not sufficiently similar to one of the non-security

---

**2.** Appellants argue that the district court erred in deciding the RICO vicarious liability issue. In light of the district court's view that the requirements of 28 U.S.C. § 1292(b) were not met with respect to that issue, we decline the invitation to decide it on this interlocutory appeal.

**3.** The SEC confines itself to arguing that the participations were notes. Although the arguments of appellants and the SEC on this issue differ in minor respects, we consider them together under the general rubric of "appellants."

**4.** In *Reves,* the Supreme Court identified the types of notes that are not securities as:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a character loan to a bank customer, short-term notes secured by an assignment of accounts receivable, ... a note which simply formalizes an open-account debt incurred in the ordinary course of business ... [and] notes evidencing loans by commercial banks for current operations.
>
> 494 U.S. at 65, 110 S.Ct. at 951 (citations and quotations omitted).

instruments, then we must determine whether another category of such instruments should be judicially created by reference to the same four factors, identified in *Reves* as follows:

> (1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary.

*Banco Espanol,* 973 F.2d at 55 (citing *Reves,* 494 U.S. at 66–67, 110 S.Ct. at 951–52). In using this analysis, it is important to bear in mind that "a participation in an instrument might in some circumstances be considered a security even where the instrument itself is not." *Id.* at 54; see also *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230, 240–42 (2d Cir.1985).

The district court recognized that notes secured by a mortgage on a home, in the traditional mortgage transaction, are among the enumerated categories of non-securities. See *Exchange Nat'l Bank,* 544 F.2d at 1138. The district court then examined the mortgage interests at issue by reference to the *Reves* factors and concluded that they were not "notes" within the scope of the 1933 and 1934 Acts.

We disagree, and we hold that the instruments here are "notes" within the meaning of the securities acts.[5] For reasons that will become clear as we address each of the four *Reves* factors, we believe that these instruments do not sufficiently resemble the traditional note secured by a home mortgage to be exempt from regulation under the securities laws. Nor do we believe that the *Reves* factors warrant the creation of an additional category of non-securities for these instruments.

### B. Application of the *Reves* Factors

#### 1. The Motivations of Buyer and Seller

The first *Reves* factor requires a court to "examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it." 494 U.S. at 66, 110 S.Ct. at 951. The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security).

The district court found that the buyers and seller of the mortgage participations were motivated by commercial rather than investment considerations. The court stated that "the complaint indicates that the loan proceeds were to be used for cooperative conversions and renovation of commercial space." The court regarded Eagle as the seller of the mortgage interests, and characterized Eagle's motivations as commercial because it earned a fee for servicing the mortgages while obtaining funds to engage in additional loan transactions. The district court further found that appellants, as buyers, were commercially motivated because they received "interest on their investment at a fixed rate and apparently had no prospect for profits in excess of the interest paid" and personal guarantees by the principals of Eagle.

Appellants argue that this was error in several respects. First, the amended complaint alleged that Laidlaw and Twiste were sellers, as agents of Eagle. Second, the motivations ascribed to Eagle and to appellants by the district court are more properly characterized as investment than commercial.

We agree with appellants that the motivations of the parties to this transaction are more accurately characterized as investment rather than commercial. We acknowledge that this may be a close question with respect to the seller—or sellers. Cf. *Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1539 (10th Cir.1993). Nevertheless, we believe that the somewhat stronger position is that Eagle was raising funds for its general business activities of making and servicing

---

5. In view of our holding, we do not find it necessary to decide whether, as appellants argue, the mortgage participations are also investment contracts under *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), regulated by the securities laws.

mortgages. This would seem to be an investment motivation because "the seller's purpose [was] to raise money for the general use of a business enterprise or to finance substantial investments." *Reves,* 494 U.S. at 66, 110 S.Ct. at 951. Moreover, with respect to the buyers, we regard motivation as not even a close question. The instruments were obtained for appellants by their investment adviser as part of their investment portfolios. Appellants sought to invest funds in secure, conservative instruments. Most of the instruments that such investors would take positions in, such as investment grade commercial bonds, would have a fixed rate of return in the form of interest. Such bonds are nonetheless regulated as securities. The Supreme Court has specifically recognized that "profit" means " 'a valuable return on an investment,' which undoubtedly includes interest." *Reves,* 494 U.S. at 68 n. 4, 110 S.Ct. at 952 n. 4. We therefore believe that the district court erred in finding that the fixed rate of return cut against the presumption that the notes are securities. Since the buyers' motivation was so clearly to invest, we would adhere to this view even if we accepted the district court's characterization of Eagle's motivation.

With regard to the effect of the Eagle guarantees, there is a preliminary procedural question: Appellants argue that the district court erred in considering them at all on the basis of unauthenticated documentation submitted with the motion to dismiss, particularly since the documents apparently did not represent all or even most of the transactions at issue. Although this argument is substantial, we need not deal with it.[6] Even on the assumption that there were guarantees, appellants were not directly involved in the transactions, and they had no more opportunity to evaluate the value of the Eagle guarantees than they had to evaluate the underlying mortgages or the participations that they purchased. Moreover, the degree of safety of an investment does not call into doubt the applicability of the securities laws. See *Ex-*

*change Nat'l Bank,* 544 F.2d at 1136 ("the securities laws cover debt, even supposedly gilt-edged debt, as well as equity").

### 2. The Plan of Distribution

The district court found that appellants' allegations of a broad plan of distribution, encompassing unsophisticated investors, "militate[d] against a finding that the mortgage participations here are not securities." In other words, the plan of distribution supported a finding that regulation of these participations as securities is consistent with Congressional intent to protect unsophisticated investors.

Not surprisingly, appellees take issue with this portion of the district court's analysis. In this context, Laidlaw emphasizes that the mortgage participations were purchased through a discretionary account managed solely by Twiste, an experienced and sophisticated investment manager. Therefore, Laidlaw argues, the plan of distribution cuts against application of the securities laws.

We do not agree with this contention. By this argument, Laidlaw may be attempting to bring this case factually closer to *Banco Espanol,* in which we emphasized that restrictions on the marketing of certain loan participations strongly suggested that there was no need for the protection of the federal securities laws. The elements of the plan of distribution that we stressed in *Banco Espanol* included that only institutional and corporate entities were solicited, detailed individualized presentations were made to potential purchasers and resales were prohibited without the express written permission of the broker. 973 F.2d at 55. The marketing scheme in *Banco Espanol* was more analogous to a group of highly sophisticated commercial entities engaging in short-term commercial financing arrangements than to the securities markets. In contrast, the record before us does not suggest that the participations here were restricted to sophisticated investors

---

**6.** Appellants allege that the notes were not guaranteed. Appellees dispute this claim, relying on materials outside of the complaint. Appellants argue that the district court was required either to exclude this evidence or to convert appellees' motion to dismiss to one for summary judgment, and give appellants the opportunity to submit materials in rebuttal. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988).

who had "the capacity to acquire information about the debtor." *Id.*

In *Banco Espanol,* "we rule[d] only with respect to the loan participations as marketed ... [and] recognize[d] that even if an underlying instrument is not a security, the manner in which participations in that instrument are used, pooled, or marketed might establish that such participations are securities." *Id.* at 56 (citing *Gary Plastic Packaging Corp.,* 756 F.2d at 240–42). The district court in this case correctly concluded that the broad-based, unrestricted sales to the general investing public alleged in the complaint support a finding that these instruments are within the scope of the federal securities laws.

### 3. The Reasonable Expectations of the Investing Public

Despite finding that the purchasers of these mortgage instruments were unsophisticated, passive investors who had simply placed their money in discretionary accounts with instructions to make conservative investments, the district court concluded that the "members of the investing public would reasonably expect that the instruments in this case were not securities." Appellants argue that these findings are inconsistent, and point out that they have alleged that they believed that all of the money in their discretionary accounts was being invested, in accordance with their wishes, rather than being used in commercial loan transactions. The district court apparently believed that investors would not expect these interests to be securities because of the fixed interest rate and the Eagle guarantees.

We believe that the district court's analysis of this factor was erroneous. As indicated above, neither the fixed interest rate nor the personal guarantees (assuming they existed) justified characterizing appellants' motivations as anything but investment. Nor do these factors alter the reasonable expectations of investors, pursuing what they believed was a conservative investment strategy through registered professionals in the securities industry, that they were protected by the federal securities laws.

### 4. Risk–Reducing Factor

In applying the final *Reves* factor, the district court held that federal securities regulation is unnecessary here because collateralized mortgages are regulated under New York State law. The district judge relied on *Singer v. Livoti,* 741 F.Supp. 1040 (S.D.N.Y. 1990), for the proposition that Congress regarded real property transactions as essentially local in nature and did not "intend[ ] to sweep them into the statutory scheme for the regulation of securities transactions." *Id.* at 1051.

Appellants take issue with this analysis on a number of grounds. They point out that the amended complaint specifically alleges that the mortgage participations were "not secured" and were "uncollateralized." Moreover, *Singer* involved "allegations of federal securities fraud on the part of an attorney who helped to arrange financing for a real estate development that later failed." 741 F.Supp. at 1041. In *Singer,* the judge pointed ed out:

> [Mortgage] instruments are ordinarily generated, as this one was, through the intermediary of a licensed professional, such as an attorney, real estate broker or mortgage broker. New York maintains a complete statutory scheme to assure fidelity of these professionals to their clients and customers.... Furthermore, all states provide for public recordation of mortgages, an opportunity for mortgage lenders to search out prior liens and defects in title in the public record before investing, and give statutory protection by such recordation against subsequent encumbrancers of the collateral.

*Id.* at 1050 (citations omitted). Appellants argue that whatever protections might have been provided in the situation described in *Singer,* they were of little if any use in reducing the risk in the situation before us. Appellants perhaps could have taken discretion from their adviser's hands, conducted face-to-face negotiations with borrowers, inspected the properties involved, checked the records for liens, obtained title insurance and used the services of a lawyer, as persons lending money through mortgages generally do. But, appellants argue, that is not what

happened here. Invocation of protections that might apply to the more usual mortgage loan distorts the character of these transactions.

Finally, appellants claim that the fourth *Reves* factor does not contemplate protections under state law, but refers only to protection under federal law that would render application of the securities laws unnecessary.

We agree with appellants that the district court erred in concluding that New York State regulations concerning mortgages afforded protection sufficient to render unnecessary the application of the federal securities laws to these mortgage participations. In doing so, we do not decide whether state law can be the source of such alternative protection, although it is true that the cases on which *Reves* relied in discussing this factor, 494 U.S. at 69, 110 S.Ct. at 953, did involve alternative schemes of *federal* regulation. See *Marine Bank v. Weaver*, 455 U.S. 551, 558, 102 S.Ct. 1220, 1224, 71 L.Ed.2d 409 (1982) (federal regulation of banks and FDIC insurance); *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 569–70, 99 S.Ct. 790, 801–02, 58 L.Ed.2d 808 (1979) (ERISA); see also 2 Loss & Seligman at 877 & n. 27. Our holding is limited to the facts as alleged in the complaint, according to which appellants held "uncollateralized, speculative participations in mortgages" and had not engaged in the usual process for extending such a loan.

Appellees argue that appellants did have the protection of federal law, namely the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 et seq., and ERISA. However, we agree with appellants that the former statute was intended to complement, rather than substitute for, the 1933 and 1934 Acts. *Laird v. Integrated Resources, Inc.*, 897 F.2d 826, 834–35 (5th Cir.1990). With regard to ERISA, it is true that appellants seek to add an ERISA claim in their second amended complaint, but they point out that ERISA would apply to only a small percentage of the participations. Under the circumstances, we need not decide whether appellants are correct in arguing that in this case ERISA "cannot come close to serving as a compre-

hensive replacement for the federal securities laws."

Thus, on the limited record before us, we conclude that the district court misapplied the *Reves* analysis, and that the mortgage participations as alleged in the complaint are notes within the scope of the federal securities laws.

We reverse the January 1993 order of the district court, and remand the case for further proceedings consistent with this opinion.