Craig ROER and Margaret Roer, Plaintiffs,

v.

OXBRIDGE INCORPORATED, Win Capital Corp., Frederick L. Gorsetman, Barry L. Hawk and Zachary Yosef Liebman, Defendants.

No. 99–CV–5018 (JS).

United States District Court, E.D. New York.

Sept. 26, 2001.

Kevin T. Grennan, Esq., Law Office of Kevin T. Grennan, Uniondale, NY, for Plaintiffs Craig Roer, Margaret Roer.

David I. Lewittes, Esq., Wollman, Babitt & King, L.L.P., New York, for Defendants Oxbridge, Inc. and Frederick L. Gorsetman.

Thomas J. Fleming, Esq., Olshan Grundman Frome, New York, NY, for Defendants Win Capital Corp. and Zachary Yosef Liebman.

Stephen B. Wexler, Esq., Wexler & Burkhart, P.C., Mitchell Field, NY, for Defendant Barry L. Hawk.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Craig Roer and Margaret Roer ("plaintiffs") commenced this action on August 23, 1999, alleging multiple violations of federal securities laws under Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. §§ 78j(b) and 78t, and Sections 12(2) and 15 of the Securities Act of 1933 (the "'33 Act"), 15 U.S.C. §§ 77l(2) and 77o. Plaintiffs additionally assert state law claims pursuant to Section 349 of the New York General Business Law as well as common law claims sounding in breach of fiduciary duty, negligence, fraud and/or negligent misrepresentation, and breach of contract.

Pending before the Court are the defendants' respective motions to dismiss all claims against them in the Amended Complaint.[1] Specifically, defendants Oxbridge Incorporated ("Oxbridge"), Win Capital Corp. ("Win Capital"), Frederick L. Gorsetman ("Gorsetman"), Barry L. Hawk ("Hawk")[2] and Zachary Yosef Liebman ("Liebman") seek to dismiss all claims against them pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1) and 12(b)(6), and The Private Securities Litigation and Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b).

### FACTUAL ALLEGATIONS

The following factual allegations are taken from plaintiffs' Amended Complaint and accepted as true for purposes of this motion to dismiss. *See Zinermon v. Burch,*

---

**1.** Plaintiffs filed the Amended Complaint on December 30, 1999.

**2.** Hawk did not submit a memorandum of law in connection with his motion to dismiss the Amended Complaint.

494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Charles W. v. Maul,* 214 F.3d 350, 356 (2d Cir.2000). In addition, the Court deems the Amended Complaint to include all documents incorporated by reference, to the extent submitted by the parties, public disclosure documents required by law to be, and have been, filed with the SEC, as well as documents the plaintiffs either possessed or knew about and upon which they relied in commencing suit. *See Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989)).

On or about May 11, 1998, Craig Roer met with defendants Hawk and Liebman in Melville, New York, at which time Hawk and Liebman recommended that Craig Roer invest in United Recycling, Inc. ("URI"), a Minnesota corporation engaged in the business of recovering fibers from used carpet for sale as feedstock to compounders and manufacturers for thermoplastic and nonwoven textile applications. Am. Compl. ¶ 19. During their meeting, Hawk stated to Craig Roer that he "was a registered representative and Director of [Oxbridge]" and further provided Craig Roer with an Oxbridge business card which had Hawk's name on it. *Id.* At all times relevant, defendant Gorsetman was the President, majority shareholder, and Chairman of the Board of Oxbridge. Am. Compl. ¶¶ 38–40. Gorsetman was also the President and Director of Oxbridge Funding, Inc. which, in turn, was the Manager of Oxbridge Investors, L.L.C. Am. Compl. ¶¶ 41–42. Gorsetman likewise was President and Chairman of the Board of Oxbridge Investors, L.L.C. Am. Compl. ¶¶ 44–45. Oxbridge Investors, LLC was the General Partner of Oxbridge URI, L.P. which, in turn controlled URI through its General Partner Oxbridge Investors, LLC. Am. Compl. ¶ 46. Gorsetman was the General Partner of Oxbridge URI, L.P. *Id.* Defendant Hawk maintained an office at Oxbridge's place of business. Am. Compl. ¶ 82.

During their May 11, 1998 meeting, Craig Roer informed Hawk and Liebman that "he was presently unemployed and that he could not afford to lose any money." Am. Compl. ¶ 20. In response, Hawk and Liebman told Craig Roer that an investment in URI would return between one hundred percent and four hundred percent of his original investment. Am. Compl. ¶ 22. At the May 11, 1998 meeting, both Hawk and Liebman individually stated to Craig Roer that "they had a company waiting in the wings to buy [URI]" and that "he would receive a return on his investment between one hundred percent to four hundred percent...." *Id.* According to Hawk and Liebman, the buyout of URI would occur by October or November of 1998. *Id.* Hawk and Liebman also told Craig Roer that URI would be profitable within sixty days. *Id.* In reliance on Hawk and Liebman's statements, on May 11, 1998, plaintiffs purchased 396,963 common stock purchase warrants of URI ("warrants") and a $100,000 Senior Secured Note of URI with a maturity date of June 30, 1998 ("URI Note"). Am. Compl. ¶ 23. The URI Note provided for payment on June 30, 1998 of $100,000 plus interest on the outstanding principal amount at a rate of 12% per annum. Affidavit of Frederick L. Gorsetman dated October 21, 1999 ("Gorsetman Aff."), Ex. C (URI Note). The warrants included in the deal entitled plaintiffs to purchase URI common stock at $.25 per share between May 11, 1998 and May 11, 2008. Gorsetman Aff., Ex. B (warrants). Plaintiffs paid a total of $100,000 for both

the warrants and the URI Note. Am. Compl. ¶ 23.

Following the May 11, 1998 meeting, Craig Roer spoke individually to both Hawk and Liebman who each again represented to him that they "had a company waiting in the wings ready to buy out [URI]" and that he would receive a return of one hundred percent to four hundred percent on his "$100,000 investment" and that the buyout of URI would occur by October or November of 1998. Am. Compl. ¶ 24.

Thereafter, in or about June 1998, Hawk telephoned Craig Roer and recommended that the plaintiffs "invest in a Secured Promissory Note and Additional Understandings" of Firestorm Pictures, LLC ("Firestorm"), a California company involved in the production of motion pictures. Am. Compl. ¶ 25. In the course of their conversation, Hawk informed Craig Roer that "he would receive a 50% return on his money within a two month period." *Id.* Additionally, Hawk further stated to Craig Roer that Firestorm was going to produce movies with Miramax and that Firestorm had an insurance policy with "Oppenheimer" on any movies made such that plaintiffs' investment with Firestorm would be protected from any losses. *Id.* Hawk also told Craig Roer that he would be investing his own money into Firestorm, that he was an attorney and, as such, plaintiffs should trust his advice and invest in Firestorm. *Id.* Lastly, Hawk told Craig Roer that there was a motion picture deal pending with respect to Firestorm. *Id.*

On July 10, 1998, plaintiffs "agreed to invest in, and did invest in," a Secured Promissory Note dated July 9, 1998 in the amount of $50,000 ("July 9, 1998 Firestorm

Note") and a letter of "Certain Additional Understandings" dated July 9, 1998 ("July 9, 1998 Letter Agreement"), by mailing a check for $50,000 to the main office of Oxbridge and made payable to Firestorm. Am. Compl. ¶ 26. The July 9, 1998 Firestorm Note provided for payment of the principal amount plus interest at an annual rate of 12% no later than October 30, 1998. Gorsetman Aff., Ex. F (July 9, 1998 Firestorm Note). Pursuant to the terms of the July 9, 1998 Firestorm Note, plaintiffs were to receive a "production fee" and an interest in the "producer's net profit", as those terms were defined by the July 9, 1998 Letter Agreement, as "Additional Consideration" for their investment. *Id.* Plaintiffs agreed to the investment in reliance upon the statements and representations made by Hawk. *Id.*

During their conversation, Hawk advised Craig Roer that he should invest an additional $25,000.00 in Firestorm and "assured Craig Roer that Firestorm ... would pay him a seventy [-]five percent return on his total investment in Firestorm ... in two months." *Id.* Thereafter, on or about October 15, 1998, plaintiffs "agreed to invest and believed at the time that they did invest an additional $12,500.00 ... in Firestorm." Am. Compl. ¶ 28. Specifically, in exchange for the July 9, 1998 Firestorm Note, Firestorm Pictures, LLC issued plaintiff a new Secured Promissory Note dated October 29, 1998 ("October 29, 1998 Firestorm Note"), which promised to pay plaintiffs principal and interest in the total sum of $87,500 and a new letter of Certain Additional Understandings dated October 29, 1998 ("October 29, 1998 Letter Agreement") which superseded the previously issued July 9, 1998 Letter Agreement.[3] Gorset-

---

**3.** Interestingly, the only document not provided to the Court is a copy of the October

29, 1998 Firestorm Note. As such, the Court is unable to determine the maturity date of

man Aff., Ex. H (October 29, 1998 Letter Agreement). Plaintiffs allege that the additional $12,500.00 they intended to invest in Firestorm was diverted to an entity called Stourbridge Investments, Ltd. ("Stourbridge"). *Id.* Plaintiffs base their belief on a "Paying Agent and Security Agreement" between Firestorm and other parties listing the address of Stourbridge and a personal check, dated October 15, 1998, made payable to Stourbridge in the amount of $12,500.00 and signed by Craig Roer. *Id.; see also* Affidavit of Craig Roer dated February 21, 2000 ("Roer Aff.") at Ex. E.

In or about November 1998, Hawk informed Craig Roer that Firestorm's deal with Miramax fell through, but that another company would eventually be found to produce the motion picture. Am. Compl. ¶ 29. At that time, Hawk reiterated to Craig Roer that his investments in Firestorm were protected because the motion picture Firestorm intended to produce was insured with Oppenheimer. *Id.* Also in November 1998, Hawk further informed Craig Roer that the company waiting in the wings to purchase URI "never materialized." Am. Compl. ¶ 30.

Subsequently, in January 1999, Hawk told Craig Roer that a group of investors from Florida was planning to invest money in Firestorm and that Craig Roer's investment would be returned to him with the previously promised seventy-five percent return. Am. Compl. ¶ 31. In March 1999, Hawk advised Craig Roer that the anticipated investors from Florida, with respect to the Firestorm investment, "never materialized," but that he should not be concerned because "they were working on deals in California and his investment in Firestorm ... would be returned with the previously promised 75% return." Am. Compl. ¶ 32.

In or about February 1999, Hawk informed Craig Roer that URI would be sending him an interest payment due on the $100,000 Senior Secured note "shortly." Am. Compl. ¶ 33. The interest payment was never made. *Id.*

Following this turn of events, in March 1999, Craig Roer met with Gorsetman and informed him that he wanted all of the money he and his wife invested in URI and Firestorm returned. Am. Compl. ¶ 34. In response, Gorsetman allegedly assured Craig Roer that he "would find someone to take [plaintiffs] out of their positions and return their money." *Id.* Gorsetman also told Craig Roer during their meeting that URI "was going to be doing a big deal with Allied Signal Corp." *Id.* During the months of March and April of that same year, Gorsetman advised Craig Roer to "push defendant Hawk to find someone to buy out his positions and that defendant Hawk should take on some of the responsibility of returning the moneys invested by [plaintiffs]." Am. Compl. ¶ 35. Thereafter, in May 1999, Gorsetman allegedly "insisted" that Allied Signal Corp. would be providing URI with a substantial contract that would "put [URI] in the black." Am. Compl. ¶ 36.

---

the October 29, 1998 Firestorm Note which apparently extended the October 30, 1998 maturity date set forth in the July 9, 1998 Firestorm Note. *See* Gorsetman Aff., Ex. H (October 29, 1998 Letter Agreement) at 2. Moreover, in the absence of such documents it is not clear whether the "Additional Consideration" set forth in the July 9, 1998 Firestorm Note including, *inter alia,* an interest in the producer's net profits, was included, supplemented, or even superseded by the October 29, 1998 Firestorm Note despite the terms of the October 29, 1998 Letter Agreement which state that plaintiffs' participation in the producer's net profits was "in exchange for the extension of the Loan and ... additional undertakings." *Id.*

At present, plaintiffs claim the common stock purchase warrants of URI are worthless and that URI has defaulted on the URI Note. Am. Compl. ¶ 47. Additionally, plaintiffs claim that Firestorm also has defaulted on the October 29, 1998 Firestorm Note. Am. Compl. ¶ 48. Based on these allegations, plaintiffs claim defendants have violated §§ 10(b) and 20 of the '34 Act, and §§ 12(2) and 15 of the '33 Act as well as several state laws.

Specifically, with respect to plaintiffs' purchase of the URI Note and URI common stock purchase warrants, plaintiffs allege that defendants Hawk and Liebman knowingly and/or recklessly made material misrepresentations of fact in connection with that transaction because oral statements made by Hawk and Liebman during and after the May 11, 1998 meeting "were untrue when made" and "material to the [p]laintiffs' investment decision and relied upon by the [p]laintiffs." Am. Compl. ¶ 51 and ¶ 51(a)-(g), ¶ 61 and ¶ 61(a)-(d), (g). Plaintiffs additionally allege that, in connection with the purchase of the URI Note and URI common stock purchase warrants, defendants Hawk and Liebman made several omissions of fact that would have been material to plaintiffs' investment decisions. In particular, plaintiffs allege that Hawk and Liebman failed to disclose (1) that the URI transaction was "highly speculative and involved a high degree of risk and involved a high degree of risk of loss of the entire investment" and (2) that previously issued notes of URI were in default at the time of plaintiffs' purchase. Am. Compl. ¶ 53, 62. Plaintiffs also contend that defendants Oxbridge, Gorsetman, and Win Capital likewise are primarily liable to plaintiffs under § 10(b) and/or liable as controlling persons under § 20(a) based on their involvement in the URI transaction.

With respect to plaintiffs' purchase of the July 9, 1998 Firestorm Note and October 29, 1998 Firestorm Note, plaintiffs' allege that defendant Hawk knowingly and/or recklessly made several material misrepresentations of fact because the oral statements made by Hawk and relied upon by defendants in connection with that transaction "were untrue when made". Am. Compl. ¶ 52 and ¶ 52(a)-(m). In addition, plaintiffs allege that, in connection with the Firestorm deal, Hawk knowingly and/or recklessly omitted to state material facts necessary to make his affirmative statements not misleading, including, (1) that the purchase of the Firestorm Senior Secured Note was "highly speculative and involved a high degree of risk and involved a high degree of risk of loss of the entire investment"; (2) that Firestorm was a small Limited Liability Company incorporated in July of 1998; and (3) that the $12,500 plaintiffs intended to invest with Firestorm would be diverted to Stourbridge. Am. Compl. ¶ 54 and ¶ 52(a)-(c). Finally, plaintiffs further contend that defendants Oxbridge and Gorsetman also are primarily liable to plaintiffs under § 10(b) and/or liable as controlling persons under § 20(a) based on their involvement in the Firestorm transaction.

In response, defendants move to dismiss the Amended Complaint on the following grounds: (1) plaintiffs have failed to set forth a prima facie case against defendants Oxbridge, Gorsetman and Win Capital as "controlling persons" or as "primary wrongdoers"; (2) plaintiffs have failed to state a claim for a primary violation of § 12(2) of the '33 Act and § 10(b) of the '34 Act; (3) neither the URI Note, July 9, 1998 Firestorm Note, nor October 29, 1998 Firestorm Note are a "security" for purposes of § 10(b) of the '34 Act; (4) plaintiffs fail to allege any actionable misrepresentation or omission with respect to the common stock purchase warrants; (5)

plaintiffs' claims are time barred under the applicable statute of limitations; and (6) the pendent state law claims should be dismissed.

## LEGAL STANDARD

A district court should grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)); *Annis v. County of Westchester*, 36 F.3d 251, 253 (2d Cir. 1994).

In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff and accept these factual allegations as true. *H.J. Inc.*, 492 U.S. at 249, 109 S.Ct. at 2906; *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Christ Gatzonis Elec. Contractor, Inc. v. New York City Sch. Constr. Auth.*, 23 F.3d 636, 639 (2d Cir. 1994); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 165, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (citing Fed.R.Civ.P. 8(a)(2) to demonstrate liberal system of 'notice pleading' employed by the Federal Rules of Civil Procedure).

The court's duty "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980). *Accord Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). The appropriate inquiry, therefore, is not "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686; *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123–24 (2d Cir.1991) (plaintiff is not compelled to prove his or her case at the pleading stage).

Additionally, a claimant is not required to set out in detail the facts upon which he or she bases a claim. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). A claimant need only give a statement of his or her claim that will give defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Id.* Therefore, where a complaint is filed that charges each element necessary to recover, dismissal of the case for failure to set out evidential facts can seldom be warranted. *United States v. Employing Plasterers Ass'n of Chicago*, 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618 (1954). Individual allegations, however, that are so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains are meaningless as a practical matter and, as a matter of law, insufficient to state a claim. *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.1987). Additionally, as previously noted, on a motion to dismiss a complaint shall be deemed "to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ... as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit ...." *Rothman*, 220 F.3d at 88–89 (citations omitted).

It is within this framework that the Court addresses the present motion.

## DISCUSSION

### I Claims Under the '34 Act

In the Amended Complaint, plaintiffs allege that each of the defendants violated

the provisions of the '34 Act. First, plaintiffs allege that each of the defendants are primarily liable to plaintiffs under § 10(b) and Rule 10b–5 promulgated thereunder. Second, to the extent the allegations do not support a claim for primary liability under § 10(b) and Rule 10b–5 against Gorsetman, Oxbridge, and Win Capital, plaintiffs allege that those defendants are nevertheless liable under § 20(a) of the '34 Act as "controlling persons."

### A. Primary Liability under § 10(b) and Rule 10b–5

To state a claim under § 10(b) or Rule 10b–5, plaintiffs must allege the following: defendants made "(1) misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Corp.*, 163 F.3d 102, (2d Cir.1998). Defendants, all of whom appear to join in the arguments presented by counsel for Oxbridge and Gorsetman, challenge the sufficiency of plaintiffs' allegations on a number of levels. First, defendants contend that none of the notes purchased by plaintiffs are "securities" under either the '33 or '34 Acts. Second, defendants maintain that the allegations of their misrepresentations and omissions pertained only to the notes, not the URI warrants, and therefore were not "in connection with" the sale or purchase of a security. Similarly, defendants assert the alleged misrepresentations and omissions of defendants Gorsetman and Oxbridge did not occur until months after the subject transactions and likewise were not "in connection with" the purchases of securities. Third, defendants argue that the alleged oral misrepresentations are not actionable because they contradict written materials provided to plaintiffs at the time of the purchases. Finally, defendants assert that the allegations of scienter fail to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and § 78u–4(b) of the PSLRA. The Court will address each of these contentions in turn.

(i) *Whether the Notes Issued to Plaintiffs were "Securities" under the '34 Act.*

Section 3(a)(10) of the '34 Act defines a "security", in relevant part, as "any note" or "warrant", but excludes from its definition "any note ... which has a maturity at the time of issuance of not exceeding nine months ...." 15 U.S.C. § 78c(a)(10). As such, defendants argue that since the URI Note and July 9, 1998 Firestorm Note are short-term notes with a maturity date of less than nine months, they are a not a "security" covered by § 10b and Rule 10b–5. Defendants' literalist approach to this definition, an apparent source of much discourse among the courts in this circuit and others, has been explicitly rejected by the Second Circuit. *See Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795 (2d Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973). In *Zeller*, the Second Circuit held that "the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b–5, unless the note fits the general notion of 'commercial paper' ...." *Id.* at 800. *See also Reves v. Ernst & Young*, 494 U.S. 56, 70–71, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (declining to determine whether exclusion of short-term notes in § 3(a)(10) should be given literal effect); *SEC v. American Bd. of Trade, Inc.*, 751 F.2d 529, 538 (2d Cir.1984) (noting that decisional law bars a literal reading of § 3(a)(10) and that a note with maturity less than nine months may be a "security"); *cf. Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1138

(2d Cir.1976) (enumerating categories in which notes with a maturity exceeding nine months may not constitute a "security") and *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir.1984) (same). Following the development of various approaches by several circuits to the vexing issue of whether a note constitutes a security under federal securities laws, significant guidance was finally provided by the Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990).

■ In determining whether a note fits within the definition of a "security", courts apply the "family resemblance" test articulated by the Supreme Court in *Reves. See Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 811 (2d Cir.1994). "Under the family resemblance test, a note is presumed to be a security unless the note resembles one of the several judicially-enumerated instruments that are not securities." *Id.* (citing *Reves*, 494 U.S. at 65, 110 S.Ct. 945). The types of notes not included within the definition of a security are:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a character loan to a bank customer, short-term notes secured by an assignment of accounts receivable, ... a note which simply formalizes an open-account debt

incurred in the ordinary course of business ... [and] notes evidencing loans by commercial banks for current operations.

*Id.* at 812 and fn. 4. Upon reviewing the notes at issue herein and drawing all reasonable inferences in favor of plaintiffs, as we must at this juncture, the Court concludes that they do not fit squarely into one of the enumerated categories. Specifically, the URI Note issued in connection with the URI warrants, both of which documents either expressly incorporate or compel definitional reference to the terms of a "Purchase Agreement" dated April 11, 1997 between URI and Oxbridge Capital L.P., render the URI Note dissimilar to any of the listed categories. Moreover, the July 9, 1998 Firestorm Note also is dissimilar to any of the enumerated categories in that it expressly grants plaintiffs an interest in the producer's net profit as additional consideration. Gorsetman Aff., Ex. F. Although defendants contend that an interest in profits only was in consideration for "additional undertakings" to be performed by Craig Roer, and not the July 9, 1998 Firestorm Note, the July 9, 1998 Letter Agreement clearly states that the share in profits is "in exchange for the extension of the Loan *and* [plaintiffs'] additional undertakings set forth [herein]". Gorsetman Aff., Ex. G (emphasis added).[4]

■ Accordingly, if the note at issue is not sufficiently similar to one of the enu-

---

4. There has been no credible argument offered that the October 29, 1998 Firestorm Note is not a security as alleged. *See* Def. Oxbridge and Gorsetman's Mem. in Support of Motion to Dismiss at 11–12. Defendants merely argue the plaintiffs have failed to allege facts tending to show that the October 29, 1998 Firestorm Note is a security. Such a contention is contrary to the notice pleading requirements of Fed. R. Civ. 8. Moreover, there has been no reference made to the maturity date of the October 29, 1990 Firestorm Note, the importance of which, as discussed

in the main text, may very well be irrelevant. In any event, despite the absence of a copy of the October 29, 1998 Firestorm Note on this motion, the October 29, 1998 Letter Agreement likewise tends to establish that any interest in producers' profits was likewise in consideration for *both* the extension of the loan and additional undertakings to be performed by Craig Roer. Gorsetman Aff., Ex. H. Thus, drawing all reasonable inferences in favor of plaintiffs, the Court assumes for purposes of this motion that the October 29, 1998 Firestorm Note was a security.

merated non-security categories, the Court next applies the four factors identified in *Reves:* " '(1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary.' " *Pollack,* 27 F.3d at 812 (quoting *Banco Espanol de Credito v. Security Pac. Nat'l Bank,* 973 F.2d 51, 55 (2d Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993)).

### 1. *Motivation*

■ First, when assessing the motivations that would prompt a reasonable seller and buyer to enter into a transaction, "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.' ". *Reves,* 494 U.S. at 68, 110 S.Ct. 945. On the other hand, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, ... the note is less sensibly described as a 'security.' " *Id.* Accepting the allegations as true, and viewing the documents considered by the Court, URI's issuance of the URI Note and detachable warrants was for general business purposes stemming from the planned expansion of URI's operations. Gorsetman Aff., Ex. D at 6 (in connection with the "planned expansion ... [URI] expects to raise a total of $1.75M through 12% subordinated investor notes with detachable warrants to purchase [URI] common stock

...""). Moreover, there is little doubt that plaintiffs' payment of $100,000 in exchange for the URI Note and URI warrants was for investment purposes. Similarly, the July 9, 1998 Firestorm Note was solicited for the purpose of financing movies and further provided plaintiffs' with an interest in profits. Gorsetman Aff., Ex. F (referring to the July 9, 1998 Firestorm Note as "having certain profit participations [in connection with] two film projects."). Thus, application of the first *Reves* factor supports the finding of a security.

### 2. *Plan of Distribution*

■ Second, in examining the plan of distribution, courts consider whether the instrument involved is one which involved "common trading for speculation or investment." *Reves,* 494 U.S. at 66, 110 S.Ct. 945 (citation omitted). Although there is no allegation that the instruments involved here were traded on a public exchange, to establish the "common trading" element, plaintiffs need only demonstrate that the instruments were "offered and sold to a broad segment of the public ... " *Id.* at 68, 110 S.Ct. 945 (citing *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985)). Again, the documents relied upon by plaintiffs in commencing this action demonstrate that the issuers of the URI and Firestorm notes sought to solicit loans from various sources, including private individuals. *See* Gorsetman Aff., Exs. D and I. Again, drawing all inferences in favor of plaintiffs, the Court cannot conclude that plaintiffs can prove no set of facts tending to establish that the subject transactions involved "broad-based, unrestricted sales to the general investing public ...." *Pollack,* 27 F.3d at 814. Accordingly, the second factor likewise supports a finding that the URI and Firestorm notes are instruments within the scope of federal securities laws.

### 3. Reasonable Expectations

█ Third, the courts examine the "reasonable expectations of the investing public." *Reves*, 494 U.S. at 66, 110 S.Ct. 945 (citation omitted). The Supreme Court has "consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'" *Id.* at 68–69, 110 S.Ct. 945 (citation omitted). Here, there can be little doubt that the public viewed these "investor notes" as an investment supporting the finding of a security. First, in the Amended Complaint, plaintiffs allege that they expected to receive a return of between "one hundred percent and four hundred percent" on their investment in the URI Note. Am. Compl. ¶ 22. Second, as previously noted, the URI Note was issued in connection with detachable warrants which entitled plaintiffs to exercise their right to purchase URI common stock. Third, plaintiffs entered into the Firestorm Notes under the belief that they would receive a fifty to seventy-five percent return on their "investment." Am. Compl. ¶¶ 25, 27. Moreover, also as previously noted, the July 9, 1998 Firestorm Note granted plaintiffs an interest in the producer's net profit, further bolstering plaintiffs' allegations that the subject transactions are more properly characterized as investments. Finally, any argument that the fixed interest rates provided by the URI Note and Firestorm notes preclude the finding of a "security" has been flatly rejected by the Second Circuit. *See Pollack*, 27 F.3d at 814 (fixed interest rate on mortgage participations does not alter reasonable expectations of investors pursuing what was believed to be an investment). Thus, it is not inappropriate, at this juncture, to characterize the subject transactions as "investments" further supporting the finding of a security.

### 4. Risk Reducing Factor

Finally, courts examine whether some factor such as the existence of an alternative regulatory scheme reduces the risk of the instruments involved, thereby rendering application of federal securities law unnecessary. *See Reves*, 494 U.S. at 67, 110 S.Ct. 945. Although it is not entirely clear whether the existence of an alternative *state* regulatory scheme renders federal securities laws unnecessary, *see Pollack*, 27 F.3d at 815 (declining to decide whether state law can be the source of such alternative protection under *Reves*), the Court need not reach that issue here. Indeed, defendants have made no argument to that effect despite noting plaintiffs' commencement of a "related case" in state court pursuant to New York Civil Practice Law Rule 3213 based upon "commercial paper." *See* Def. Oxbridge and Gorsetman's Reply Mem. at 4. Thus, for purposes of this motion only, the Court assumes that an application of the *Reves* family resemblance test to plaintiffs' allegations supports the finding of a security in connection with the URI Note and July 9, 1998 Firestorm Note.

#### (ii) *Whether the alleged Misstatements or Omissions were "in connection with" the Sale of a Security.*

Next, the Court considers defendants' argument that the alleged misstatements or omissions were not "in connection with" the sale of a security. Initially, defendants argue that the alleged misstatements or omissions pertained only to the "non-security" notes, not the detachable warrants, and are therefore not in connection with the sale of a security. This argument is without merit and requires little consideration from the Court. First, the Court already has determined that the subject notes constitute securities under federal securities laws, rendering defendants' argument inapplicable. Second, even assuming the URI note was not a security within

the meaning of § 3(a)(10), the Court's reading of the allegations contained in the Amended Complaint is not so limited. Indeed, drawing all inferences in favor of plaintiffs, the allegations of misstatements and/or omissions could easily be interpreted as addressed to the entire URI investment entered into by plaintiffs, not just the URI Note.

Defendants second argument, namely, that Gorsetman's statements or omissions were not in connection with the sale of a security because they were made several months after plaintiffs purchased each of the notes, requires consideration by the Court. Here, the Amended Complaint alleges that on or about "March and April of 1999" defendant Gorsetman "assured [plaintiffs that he] would find someone to take [them] out of their positions and return their money[ ]", told plaintiffs that "[URI] was going to be doing a big deal with Allied Signal Corp.", and advised plaintiffs that they should "push defendant Hawk to find someone to buy out [their] positions." Am. Compl. ¶¶ 34–35. Finally, the last statement attributed to defendant Gorsetman alleges that in May of 1999, Gorsetman "insisted that Allied Signal Corp. was going to give [URI] a large contract which would put [URI] in the black." Am. Compl. ¶ 36. Significantly, these statements attributed to Gorsetman were made ten months after plaintiffs purchased the URI Note, eight months after plaintiffs purchased the July 9, 1998 Firestorm Note, and five months after plaintiffs purchased the October 29, 1998 Note. Moreover, as far as the Court can ascertain, both the URI Note and July 9, 1998 Firestorm Note matured well before Gorsetman made any of these alleged statements. It is well settled that "[a] statement cannot be fraudulent [under Rule 10b–5] if it did not affect an investment decision of the plaintiff." *Mills v. Polar*

*Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993) (citing *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992) (a 10b–5 plaintiff must demonstrate that he relied on the defendant's false statements when he entered the transaction, *cert. denied*, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993)); *Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir.1992) (the plaintiff must show that the defendant's misrepresentations caused the plaintiff to invest); *Schlanger v. Four–Phase Sys. Inc.*, 555 F.Supp. 535, 538 (S.D.N.Y.1982) ("Causation is an essential element of all tort cases, and claims under 10b–5 should be no exception.")). In the absence of any allegations that Gorsetman's statements influenced the plaintiffs' investment decisions, plaintiffs' have failed to plead a Rule 10b–5 claim for primary liability against defendant Gorsetman. *See Mills*, 12 F.3d at 1175 (statements made eighteen months after plaintiff entered into transaction could not have induced plaintiff to enter into transaction). Accordingly, plaintiffs' Rule 10b–5 claim against defendant Gorsetman based on his alleged after the fact misstatements must be dismissed.

The court also finds it appropriate to address plaintiffs' remaining Rule 10b–5 claims against defendants Gorsetman, Oxbridge, and Win Capital at this juncture. To that end, the Court notes the complete absence of *any* allegations of misstatements or omissions made by either Oxbridge or Win Capital in connection with the sale or purchase of a security by plaintiffs. Indeed, plaintiffs' claims for primary liability under Rule 10b–5 against Oxbridge and Win Capital merely allege in conclusory fashion that Oxbridge and Win Capital "knew of or recklessly disregarded the Section 10(b) and Rule 10b–5 violations of [Hawk and Liebman] and rendered substantial assistance to [them] in committing those violations." Am. Compl. ¶¶ 85–88,

94–96. Plaintiffs likewise attempt to sustain their claim for primary liability under Rule 10b–5 against Gorsetman based on his knowledge or reckless disregard of Hawk's 10b–5 violations and his "substantial assistance" rendered to Hawk in connection with those violations. Am. Compl. ¶ 77. In opposition to the motion to dismiss, plaintiffs contend that "primary liability may be imposed not only on persons who made fraudulent misrepresentations, but also on those who had knowledge of the fraud and assisted in it perpetration." Plf. Mem. in Opp'n at 20.[5] This contention is a mischaracterization of the law. Following the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (rejecting private claims based on aiding and abetting liability under § 10(b)), the Second Circuit has held that "[a]llegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms . . . fall within the prohibitive bar of *Central Bank*. A claim under § 10(b) must allege a defendant has made a material misstatement or omission indicating an intent to deceive or defraud in connection with the purchase or sale of a security."

*Shapiro v. Cantor*, 123 F.3d 717, 720–23 (2d Cir.1997) (citing *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 581 (2d Cir.1990)). In the absence of any allegations that Gorsetman, Oxbridge and Win Capital made a material misstatement or omission in connection with the purchase or sale of a security, plaintiffs' claims for primary liability against those defendants must be dismissed. Plaintiffs' allegations of primary liability premised the defendants' "substantial assistance"[6] rendered in connection with the claimed fraud are of no avail, and similarly fall within the prohibitive bar of *Central Bank*. *Id.*

### (iii) *Whether the alleged Oral Misrepresentations are Actionable.*

With respect to the remaining § 10(b) and Rule 10b–5 claims against defendants Hawk and Liebman, defendants next argue that the alleged oral misstatements and omissions are not actionable because they contradict the written materials provided to plaintiffs at the time of the transaction. The court construes this argument as an attempt to invoke § 77z–1(a)(1) of the PSLRA and the judicial bespeaks caution doctrine.

---

5. Plaintiffs' reliance on a statement made by the Second Circuit in *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir.1996), although correct in their citation, is nevertheless misplaced. In *First Jersey*, the Second Circuit quoted a statement from a prior decision in *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994) ("primary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.' "), *abrogation noted by Ellison v. American Image Motor Co., Inc.*, 36 F.Supp.2d 628, 636 (S.D.N.Y.1999). The Circuit's decision in *Azrielli*, however, preceded the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) which

held that a private plaintiff may not maintain an aiding and abetting claim under § 10(b).

6. By contrast, the PSLRA, enacted after *Central Bank*, "provides that in *SEC actions*, 'any person that knowingly provides substantial assistance to another person in violation of a provision of [15 U.S.C. Chapter 2B, which includes § 10(b) ], or of any rule or regulation issued under this chapter [including Rule 10b–5], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.' " *SEC v. U.S. Environmental, Inc.*, 155 F.3d 107, 113 (2d Cir.1998) (quoting 15 U.S.C. § 78t(f)) (brackets in original and emphasis added). "Thus, unlike private plaintiffs, the SEC now has authority to assert aiding and abetting claims under § 10(b)." *Id.*

■ The Second Circuit has affirmed the dismissal of securities claims at the pleading stage where written materials provided at the time of the purchase " 'warn[s] investors of exactly the risk the plaintiffs claim was not disclosed.' " *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.*, 2001 WL 300733, *4 (S.D.N.Y. Mar.28, 2001) (quoting *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996) (brackets original)). Section 77z–1(a)(1) "establishes a two-pronged analysis for determining when corporate entities and persons will be insulated from liability for forward-looking statements that prove to be incorrect." *Id.* (citing 15 U.S.C. § 77z–2). First, forward-looking statements are protected from liability if they are "(i) 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements' or (ii) 'immaterial.' " *Id.* (quoting 15 U.S.C. § 77z–2(c)(1)(A)). Second, the PSLRA looks to the state of mind of the person making the statements and "grants protection if the plaintiff does not prove that the forward-looking statement, even if unaccompanied by cautionary language, was made 'with actual knowledge ... that the statement was false or misleading.' " *Id.* (quoting 15 U.S.C. § 77z–2(c)(1)(B)).

■ These provisions of the PSLRA were modeled after, but not meant to displace, the judicial bespeaks caution doctrine. *Id.* at *5. "The bespeaks caution doctrine allows courts to rule that a defendant's forward-looking representations contain enough cautionary language or risk disclosures to protect against claims of securities fraud." *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68 (S.D.N.Y.1996). Application of the doctrine, however, is not unlimited. Similar to § 77z–1(a)(1), the doctrine only applies to forward-looking statements which are statements contingent on future events. *See Credit Suisse First Boston*, 2001 WL 300733, *5. Additionally, "[c]autionary language cited to justify application of the doctrine must precisely address the substance of the specific statement or omission that is challenged." *In re Prudential*, 930 F.Supp. at 72 (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371–72 (3d Cir.1993)). Finally, "cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made." *Id.* (citing *Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir.1981), *rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir.1994)).

■ In the Amended Complaint, plaintiffs allege that each of the misrepresentations made by Hawk and Liebman were misleading because they "were knowingly and/or recklessly made" and "untrue when made." Am. Compl. ¶¶ 51–52, 61. Those knowingly false forward-looking statements attributed to Hawk and Liebman in connection with the URI transaction include:

That plaintiffs would receive a one hundred percent to four hundred percent return on their investment in [URI] by October or November of 1998.

That There was a company waiting in the wings to buy [URI] and when the company purchased [URI] in October or November of 1998, that the Plaintiffs would receive a return of between one hundred percent to four hundred percent of the investment in [URI].

That [URI] would be profitable within 60 days.

That Plaintiffs would not lose money on their investment in [URI].

Am. Compl. ¶¶ 51(d)-(g), 61(a)-(d), (g). In addition, the knowingly false forward-looking statements attributed to Hawk in connection with the Firestorm deals include:

> That Plaintiffs were guaranteed to receive a fifty percent return on their investment within a two month period with respect to the [July 9, 1998 Firestorm Note].

> That the Plaintiffs were guaranteed to receive a seventy five [sic] percent return on their total investment in [Firestorm] in a two month period, with respect to the [October 29, 1998 Firestorm Note and October 29, 1998 Letter Agreement].

> That [Firestorm] was going to be making motion pictures with Miramax.

> That even though the motion picture deal with Miramax fell through, that another company would be found to make the motion picture.

> That a group of investors in Florida were going to invest money in the company and that the Plaintiffs' investment would be returned to them.

> That Plaintiffs would not lose money on their investment in [Firestorm].

> That the $12,500 ... delivered by mail to defendant Hawk at [Oxbridge] ... for the purpose of making a further investment in [firestorm] would be invested in [Firestorm].

Am. Compl. ¶ 52(b)-(d), (h)-(m). At this juncture, the Court cannot conclude that plaintiffs are unable to prove their allegations that Hawk and Liebman knew these statements to be untrue when made, therefore rendering § 77z–1(a)(1) and the bespeaks caution doctrine inapplicable. *See In re Prudential*, 930 F.Supp. at 72. Moreover, plaintiffs deny having received

many of the documents relied on by defendants [7] and further point out that those documents in their possession and relied on by defendants do not expressly address their specific investments. Plf. Mem. in Opp'n at 13–15. Finally, the Court notes that the "cautionary language" relied upon by defendants, *see* Def. Gorsetman and Oxbridge's Mem. at 15–19 (citing Gorsetman Aff., Exs. A, D, and E), is so generalized that it fails to "precisely address the substance of the specific statement[s] or omission[s] that [are] challenged." *In re Prudential*, 930 F.Supp. at 72. Thus, the Court finds defendants reliance on the cautionary language in documents allegedly provided to plaintiffs at the time of their investments misplaced at this juncture.

(iv) *Application of Rule 9(b) and § 78u–4(b) of the PSLRA to the allegations of Scienter.*

 Finally, defendants Hawk and Liebman claim that plaintiffs' § 10(b) and Rule 10b–5 claims should be dismissed for failure to satisfy the heightened pleading requirements of Fed.R.Civ.P. 9(b) and § 78u–4(b) of the PSLRA. As previously noted "[t]o state a cause of action under section 10(b) and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (quoting *San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996)). "It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Ganino v. Citizens Util-*

---

**7.** In fact, defendants merely assert that "upon information and belief" several of the referenced written materials were provided to

plaintiffs. Def. Gorsetman and Oxbridge's Mem. at 17.

*ities Co.*, 228 F.3d 154, 168 (2d Cir.2000) (citing *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir.1994)). Rule 9(b) requires that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." However, Rule 9(b) further provides that, "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." In addition to Rule 9(b) pleading requirements, the PSLRA imposes heightened pleading requirements for plaintiffs in securities fraud actions. Section 78u–4(b)(2) of the PSLRA requires a securities fraud complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In a Rule 10b–5 action, "the requisite state of mind ... is an intent to deceive, manipulate or defraud." *Ganino*, 228 F.3d at 168. "A plaintiff can establish this intent either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138.

▆▆ In the case at bar, the defendants argue and the Court agrees, that the Amended Complaint fails to comply with § 78u–4(b). Pursuant to § 78u–4(b)(1), a plaintiff alleging that a defendant made an untrue statement of material fact must allege the "reason or reasons why the statement is misleading." Here, in rather circular fashion, plaintiffs merely allege that the false statements attributed to Hawk and Liebman were misleading because they were "untrue when made" without alleging any facts in support of the same. Similarly, plaintiffs have failed to

"state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). While plaintiffs attempt to plead the requisite intent by alleging that defendants Hawk and Liebman were motivated to engage in the fraud because they received compensation, *i.e.*, professional fees, from URI and Firestorm, and further had the opportunity to engage in and benefit from the fraud, *see* Am. Compl. ¶¶ 56, 64, the Court finds these allegations insufficient to plead scienter. Several courts in this circuit have held that ordinary economic motive is insufficient to plead scienter based on motive and opportunity. *See Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 495 (S.D.N.Y.2001). *Accord Ellison*, 36 F.Supp.2d at 639; *In re Health Mgmt. Inc. Sec. Litig.*, 970 F.Supp. 192, 202 (E.D.N.Y.1997). Moreover, there are absolutely no allegations that Hawk and Liebman "engaged in deliberately illegal behavior", "knew facts or had access to information suggesting that their public statements were not accurate", or that they "failed to check information they had a duty to monitor." *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000).

Accordingly, plaintiffs' federal Rule 10b–5 claim is dismissed without prejudice to replead within thirty (30) days if plaintiffs believe they can plead specific facts supporting a strong inference of fraudulent intent.

**B. Control Person Liability under § 20(a)**

▆▆ "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in

the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (citing *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996)).

 Since the Court determines that plaintiffs have failed to allege sufficiently a primary violation at this time, plaintiffs' § 20(a) claim likewise is dismissed without prejudice.

## II Claims Under the '33 Act

### A. Liability Under § 12(a)(2)

 Section 12(a)(2) of the '33 Act provides for liability against any person "who offers or sells a security ... by means of a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made not misleading." 15 U.S.C. § 77*l*(a)(2). In cases involving allegations of materially misleading statements or omissions, such as here, the phrase "oral communication" in § 12(a)(2) "is restricted to oral communications that relate to a prospectus." *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 567–68, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). In *Gustafson,* the Supreme Court defined the term "prospectus" as used by § 12(a)(2) by reference to the registration requirements of § 10 of the '33 Act, 15 U.S.C. § 77j(a). *Id.* at 568–73, 115 S.Ct. 1061 (applying "normal rule of statutory construction" and holding that definition of "prospectus" under § 12(a)(2) has same meaning as definition of prospectus under § 10). In assessing the definition of "prospectus", the Supreme Court initially determined that "whatever else 'prospectus' may mean, the term is confined to a document that, absent an overriding exemption, must include 'information contained in the registration statement.' By and large, only public offerings by an issuer of a security, or by

controlling shareholders of an issuer, require the preparation and filing of registration statements." *Id.* at 569, 115 S.Ct. 1061 (citing 15 U.S.C. §§ 77d, 77e, 77b(11)). It therefore follows that "a prospectus ... is confined to documents related to public offerings by an issuer or its controlling shareholders." *Id.*

 Applying these definitions to the case at bar, the Court initially notes that the allegations in no way refer to the use of a "prospectus", as that term has been defined, in connection with any of the allegedly fraudulent transactions. As such, any of the materially misleading statements relied on by plaintiffs cannot be deemed to relate to a prospectus, as is required under § 12(a)(2). Accordingly, plaintiffs' § 12(a)(2) claims are dismissed.

### B. Liability Under § 15

 Section 15 of the '33 Act states that " '[e]very person who ... controls any person liable under section[ ] 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person ....' " *Ellison,* 36 F.Supp.2d at 638 (quoting 15 U.S.C. § 77*o*) (brackets original). As such, § 15 imposes derivative liability upon persons who are control persons liable under § 13 of the '33 Act. *Id.* "The same considerations that apply in the context of control person liability under [§ 20(a) of the '34 Act] apply to control person liability pursuant to the ['33 Act]." *Id.* (citing *Sloane Overseas Fund., Ltd. v. Sapiens Int'l Corp., N.V.,* 941 F.Supp. 1369, 1377–78 (S.D.N.Y.1996); *In re Crazy Eddie Sec. Litig.,* 747 F.Supp. 850, 860–61 (E.D.N.Y.1990); *Harrison v. Enventure Capital Group, Inc.,* 666 F.Supp. 473, 479 (W.D.N.Y.1987)).

In light of the Court's prior dismissal of plaintiffs' § 20(a) claim for failure to state a claim for a primary violation under

§ 10(b) and Rule 10b–5, plaintiffs' § 15 claim under the '33 Act likewise is dismissed.

### III State Law Claims

In light of the dismissal of all federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims pending any amendments to the pleadings. A district court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 30 (2d Cir.1995). In declining to exercise jurisdiction over these claims, the Court has considered its decision in light of judicial economy, convenience, and fairness to the parties. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Therefore, plaintiffs' remaining claims pursuant to Section 349 of the New York General Business Law as well as their common law claims sounding in breach of fiduciary duty, negligence, fraud and/or negligent misrepresentation, and breach of contract are dismissed without prejudice.

### CONCLUSION

Accordingly, for all the aforementioned reasons, the defendants' motions to dismiss are GRANTED, in part, and DENIED in part, as follows:

1. Plaintiffs' § 10(b) and Rule 10b–5 claims against defendants Gorsetman, Oxbridge and Win Capital are DISMISSED;

2. Plaintiffs' § 10(b) and Rule 10b–5 claims against defendants Hawk and Liebman are dismissed without prejudice to replead those claims, within 30 days from the date of this Order, in accordance with the above discussion, if appropriate, and bearing in mind the PSLRA's requirement of a mandatory Rule 11 review at the conclusion of any securities action. *See* 15 U.S.C. § 78u–4(c)(1)–(2);

3. Plaintiffs' § 20(a) claims against defendants Gorsetman, Oxbridge and Win Capital are DISMISSED, without prejudice, pending amendment of the pleadings;

4. Plaintiffs' § 12(a)(2) claim is DISMISSED; and

5. Plaintiffs' § 15 claims against defendants Gorsetman, Oxbridge, and Win Capital are DISMISSED, without prejudice, pending amendment to the pleadings.

Failure to file an Amended Complaint within thirty (30) days from the date of this Order shall result in the dismissal of this action.

SO ORDERED.